IN RE C.S.

[Cite as *In re C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919.]

(No. 2006–1074—Submitted April 18, 2007—Decided September 27, 2007.)

O'Connor, J.

{¶ 1} Forty years after the Supreme Court's watershed ruling in *In re Gault* (1967), 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527, we address important questions concerning the scope of a juvenile's right to counsel in a delinquency proceeding and the waiver of that right. We hold that the juvenile's right to counsel is a right that he may waive, subject to certain conditions.

## RELEVANT BACKGROUND

{¶ 2} Appellant, C.S., was brought before the Juvenile Division of the Licking County Court of Common Pleas on August 9, 2005. At that time, he was almost 14 years old.

### A. THE INCIDENTS

{¶ 3} C.S.'s appearance in court was for purposes of two cases. The first, No. A2005–0616, charged C.S. with two counts of grand theft, felonies of the fourth degree if committed by an adult. The second, No. A2004–0329, alleged that C.S. had violated conditions of his probation, which had been imposed in an earlier, unrelated assault case.

{¶ 4} The facts of the theft case are largely undisputed; C.S. and one of his friends waived their rights to an attorney and made admissions to the police. Those admissions included statements that they had stolen two cars and had used them to traverse three central Ohio counties while committing various criminal acts from August 3, 2005, through August 7, 2005. Indeed, the magistrate hearing the case initially termed the boys' activities "a regular crime spree." The crime spree allegedly included the theft of the cars and the destruction of one, the repeated burglarizing of a trailer (stealing electronic equipment and a firearm from it), the procurement and use of alcohol and cocaine-laced marijuana, engaging in sexual relations with an adult woman, and cruelty to animals (shooting a cow and a horse multiple times).

## B. The Hearing

{¶ 5} At some point prior to an initial hearing held on August 9, 2005, C.S. and his mother received the common pleas court's notice and order to appear. The document, entitled "Order to Appear and Explanation of Rights," sets forth seven pages of information.

{¶ 6} Included on the first page of the document is a section captioned "Your Right to an Attorney." That section clearly states that "[y]ou have the right to be represented by an attorney at all stages of this proceeding" and that an attorney will be appointed if "you cannot afford an attorney and you qualify under State guidelines."

{¶ 7} The document further states, "You should contact the Clerk's Office seven (7) days in advance of your scheduled hearing and the Clerk will advise you how to apply for a Court-appointed attorney." Given that C.S. does not appear to have been taken into custody until August 7 or August 8 and that his hearing was held on August 9, he could not have complied with that notice provision.

{¶ 8} On the page that follows, after a section that sets forth "Your Rights in Court," the papers contain a section entitled "Waiver of Attorney." That section states, "The undersigned have read the instructions concerning our right to an attorney and the right to a Court-appointed attorney, if applicable. Knowing and understanding these rights, we hereby waive our right to be represented by an attorney or Court-appointed attorney. We further understand that we can be represented by an attorney in the future simply by advising the Court of our intention to do so." Ms. S. and C.S. signed the lines designated for "parent" and "juvenile" in that section.

{¶ 9} At the hearing, the magistrate stated in open court that he had "two sets of rights papers"—an apparent reference to the notice to appear and its explanation of rights. The magistrate verified that C.S. had received the papers, read

them, and understood the rights set forth on them and that C.S. and his mother had signed the papers.

{¶ 10} The magistrate also inquired of C.S. and his mother as follows:

{¶ 11} "THE COURT: Do you understand that you have the right to be represented by an attorney at today's hearing?

{¶ 12} "C.S.: Yes, sir.

{¶ 13} "THE COURT: If you cannot afford an attorney and you qualify under state guidelines, I will appoint an attorney to represent you. Do you understand that?

{¶ 14} "C.S.: Yes, sir.

{¶ 15} "THE COURT: Do you wish to go forward with today's hearing without an attorney?

{¶ 16} "C.S.: Yes, sir.

{¶ 17} "THE COURT: Ms. S., do you agree with C.S.'s decision today to go forward without an attorney?

{¶ 18} "MS. S.: Yes, sir."

{¶ 19} The magistrate then explained the charges against appellant, including the degree of the offenses charged. After each offense was stated, the magistrate asked C.S. whether he understood the charge. Each time, C.S. answered that he did.

{¶ 20} After each affirmative response, the magistrate asked whether C.S. admitted or denied the charge. C.S. admitted every charge. The magistrate then continued:

{¶ 21} "THE COURT: If you admit these charges today, C.S., that's basically the same as pleading guilty. Do you understand that?

{¶ 22} "C.S.: Yes, sir.

{¶ 23} "THE COURT: As a result then we would not have an adjudicatory hearing or trial in either of these cases. Do you understand that?

{¶ 24} "C.S.: Yes, sir.

{¶ 25} "THE COURT: Instead we would proceed directly to disposition, that is, for me to decide what punishment or conditions if any that should be imposed upon you. Do you understand that?

{¶ 26} "C.S.: Yes, sir.

{¶ 27} "THE COURT: By entering that plea you will be—well, first of all, that disposition in your case in A2005–0616 could include a commitment to the custody of the Ohio Department of Youth Services for a minimum period of six months or

twelve months and a maximum period not to exceed age twenty-one. Do you understand that?

{¶ 28} "C.S.: Yes, sir.

{¶ 29} "THE COURT: Do you understand what the Ohio Department of Youth Services is?

{¶ 30} "C.S.: Yes, sir.

{¶ 31} "THE COURT: What is it?

{¶ 32} "C.S.: Juvenile prison, sir.

{¶ 33} "THE COURT: That's correct. By entering that plea of admit you will be waiving or giving up certain Constitutionally guaranteed rights that you would otherwise enjoy. Among the rights that you will be giving up is the right to remain silent. Do you understand that?

{¶ 34} "C.S.: Yes, sir.

{¶ 35} "THE COURT: You will also be giving up the right to call witnesses and to present evidence in your defense. Do you understand that?

{¶ 36} "C.S.: Yes, sir.

{¶ 37} "THE COURT: And you'll be giving up the right to question and to cross-examine prosecution witnesses. Do you understand that?

{¶ 38} "C.S.: Yes, sir.

{¶ 39} "THE COURT: Ordinarily, C.S., the State of Ohio would be required to prove these cases against you beyond a reasonable doubt. If you enter a plea of admit, however, the State of Ohio will not have to prove anything at all. Do you understand that?

{¶ 40} "C.S.: Yes, sir.

{¶ 41} "THE COURT: Have there been any promises or threats of any sort to cause you to enter these pleas?

{¶ 42} "C.S.: No, sir.

{¶ 43} "THE COURT: Ms. S., do you agree with C.S.'s decision today to enter pleas of admission to these charges?

{¶ 44} "MS. S.: Yes, sir.

{¶ 45} "THE COURT: Then, C.S., I'll accept the pleas of admission. Is there any statement about this situation that you wish to make?

{¶ 46} "C.S.: No, sir.

{¶ 47} "THE COURT: Have you talked with your mother since you got arrested?

{¶ 48} "C.S.: No, sir.

{¶ 49} "THE COURT: Ms. S., did you have an opportunity to read the police report?

{¶ 50} "MS. S.: No, sir.

{¶ 51} "THE COURT: I think it's safe to say, Ms. S. and C.S. * * *—it's safe to assume that there will be more * * * felony charges coming. I—I don't know when. It'll—it's going to be in the jurisdiction of Perry County. They'll transfer those cases up here so we'll deal with them, but in terms of the filing the complaints, it'll be the Perry County Prosecutor that has to file those complaints. But we'll cross that bridge when we come to it. I just wanted you to know that because of the burglaries, the firearm thefts, the discharging of the firearm, animal cruelty, underage consumption, drug—felony drug possession charges— what else? What am I missing? That's probably it. Underage alcohol, possession of marijuana, possession of cocaine, burglary, animal cruelty, theft of a firearm. That pretty much covers it, doesn't it?

{¶ 52} "C.S.: Yes sir. B and E, sir.

{¶ 53} "THE COURT: And the B and E. Well, burglary. It'll be a burglary because it's a home. Did you do—oh, well, the trailer, was it—someone living in that trailer too?

{¶ 54} "C.S.: It—it was a camper, sir.

{¶ 55} "THE COURT: Okay. So that'd probably be a B and E so you'd get a B and E and a burglary. So all together, once those all get filed, you're probably looking at another three years on top of that once you add all those together. So that—that'll be coming at some time, Ms. S. A regular crime spree. Steals two cars. Basically totals them both. Shoots a cow. Shoots a horse. Steals a gun. Breaks into a house. Smokes dope. Has sex with an adult woman. Alcohol. Cocaine. Hope it was worth it. Ms. S., is there anything that you wish to say?

{¶ 56} "MS. S.: No, sir.

{¶ 57} "THE COURT: Do you know what I think, C.S., is the biggest injustice in this whole situation? Do you know?

{¶ 58} "C.S.: No, sir.

{¶ 59} "THE COURT: Well, I'll tell you what I think is the biggest injustice in the whole situation. The biggest injustice * * * is that I can only give you a year in prison. Based on what you've done over the past week, you ought to stay in prison until you're twenty-one years of age in my opinion, but I can't do that. To me, that's wrong. That's a disservice to every other taxpaying, law-abiding citizen of the state of Ohio that I can't lock you up [until you turn] twenty-one based on what you've been doing for the past week. The biggest injustice in this case is that I can only give you a year in prison. * * * [T]he way this commitment works is I'm going to commit you to [DYS] today for a minimum of a

year. Okay. But at the end of that year, however, that doesn't mean you automatically get out. The end of that year means simply that your case goes before the review authority to decide whether or not you should get out on parole. They don't have to let you out. So based on the nature of the offense, based on the opinion of our probation director * * * and based on your conduct in [DYS], it's entirely possible that you will do more than a year. But the only thing that I can guarantee that you'll do is a year. * * * So you're looking at another two and a half years on top of that once those charges are filed by Perry County. C.S., based upon your pleas of admission and the facts contained in the report in A2004–0329, I'll adjudicate you a probation violator as alleged in the motion. I'll order that you be released unsuccessfully in that—in that and all other cases. I'll order that you be released from probation unsuccessfully in all cases. Do you understand that?

{¶ 60} "C.S.: Yes, sir.

{¶ 61} "THE COURT: In A2005–0616, based upon your pleas of admission and the facts contained in the report, I'll adjudicate you delinquent on both counts. * * * On both counts, I'll order you committed to the custody of the Ohio Department of Youth Services for a minimum period of six months and a maximum period not to exceed your twenty-first birthday. I'll order that those two counts run consecutive to each other for an initial minimum commitment of twelve months. And * * * the Department of Youth Services is to ensure that [C.S.'s older brother] and C.S. are not in the same facility. I know that was your plan. Your plan was that they be in—you were—you were anxious to be arrested on these felonies so that you could go to [DYS] and be with your brother again. You're going to [DYS] but I'll ensure you're not in the same facility."

{¶ 62} C.S. and his mother were informed of their right to object to the magistrate's decision, see Juv.R. 40, and acknowledged receipt of the magistrate's decision. They waived objections and consented to the magistrate's decision.

{¶ 63} After the trial court accepted the magistrate's decision, C.S. appealed on various grounds. One of those claims is pertinent here. C.S. argued that the trial court violated his rights to counsel and due process as those rights are conferred by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Sections 10 and 16, Article I of the Ohio Constitution, R.C. 2151.32, and Juv.R. 4 and 29.

{¶ 64} After the court of appeals rejected that claim of error, we accepted C.S.'s discretionary appeal, In re C.S., 111 Ohio St.3d 1409, 2006-Ohio-5083, 854 N.E.2d 1090, to address two propositions of law. First, we address the meaning and effect of the portion of R.C. 2151.352 that states, "Counsel must be provided for a child not represented by the child's parent, guardian, or custodian," whether the right to counsel conferred on a juvenile can be waived, and, if so, what

constitutes a valid waiver. Second, we decided whether strict compliance with Juv.R. 29 is required or whether substantial compliance is sufficient.

ANALYSIS

{¶ 65} Our analysis here must be placed in the context of the juvenile courts, which occupy a unique place in our legal system.

{¶ 66} Juvenile courts are legislative creations, see *In re Agler* (1969), 19 Ohio St.2d 70, 72, 48 O.O.2d 85, 249 N.E.2d 808, "rooted in social welfare philosophy rather than in the *corpus juris,*" *Kent v. United States* (1966), 383 U.S. 541, 554, 86 S.Ct. 1045, 16 L.Ed.2d 84. The juvenile courts were premised on profoundly different assumptions and goals than a criminal court, *United States v. Johnson* (C.A.D.C.1994), 28 F.3d 151, 157 (Wald, J., dissenting), and eschewed traditional, objective criminal standards and retributive notions of justice. Instead, a new civil adjudication scheme arose, with a focus on the state's role as parens patriae and the vision that the courts would protect the wayward child from "evil influences," "save" him from criminal prosecution, and provide him social and rehabilitative services. *In re T.R.* (1990), 52 Ohio St.3d 6, 15, 556 N.E.2d 439; *Children's Home of Marion Cty. v. Fetter* (1914), 90 Ohio St. 110, 127, 106 N.E. 761; *Ex parte Januszewski* (C.C.Ohio 1911), 196 F. 123, 127.

{¶ 67} Not surprisingly then, the juvenile courts adopted proceedings that were less formal and more inquisitorial than adversarial, *In re T.R.,* 52 Ohio St.3d at 15, 556 N.E.2d 439, and a new lexicon that denoted differences between the two court systems, cf. *State v. Hanning* (2000), 89 Ohio St.3d 86, 89, 728 N.E.2d 1059 (noting that "delinquency" does not equate to "criminal" and that "respondents" are not "defendants"). As one Ohio court explained, "Delinquency has not been declared a crime in Ohio, and the Ohio juvenile act is neither criminal nor penal in its nature, but is an administrative police regulation of a corrective character; and while the commission of the crime may set the machinery of the juvenile court in motion[,] the accused was not tried in that court for his crime but for incorrigibility." *State v. Joiner* (C.P.1917), 28 Ohio Dec. 199, 20 Ohio N.P.(N.S.) 313, 319, 1917 WL 1173, *2, citing *Ex parte Januszewski,* 196 F. at 127–128.

{¶ 68} Considered "a monument to the enlightened conviction that wayward boys may become good men," *In re Agler* (1969), 19 Ohio St.2d 70, 71, 48 O.O.2d 85, 249 N.E.2d 808, juvenile courts were lauded as " 'one of the most significant advances in the administration of justice since the Magna Carta.' " *Cox v. Turley* (C.A.6, 1974), 506 F.2d 1347, 1354, quoting Roscoe Pound, Guide for Juvenile Court Judges (1957) 127. They were widely left to operate without legal oversight for the first half of the 20th century. See, e.g., Mark R. Fondacaro, Christopher Sloggin, and Traci Cross, Reconceptualizing Due Process in Juvenile Justice: Contributions from Law and Social Science (2006), 57 Hastings L.J. 955,

956. But with time, much of the beneficence that underlay the genesis of juvenile courts eroded. And with that erosion came increased constitutional oversight.

{¶ 69} By midcentury, it was clear that the juvenile courts not only had the authority to impose significant penalties but that they frequently did so. Amid increasing disaffection with juvenile courts and some of their judges during the 1960s and 1970s, see, e.g., *McKeiver v. Pennsylvania* (1971), 403 U.S. 528, 534, 543–544, 91 S.Ct. 1976, 29 L.Ed.2d 647 (plurality opinion), came increasing recognition of due process rights and constitutional scrutiny of police action.

{¶ 70} By that era, the Supreme Court recognized that a juvenile could "receive[ ] the worst of both worlds" in the juvenile court system by being provided "neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children." *Kent,* 383 U.S. at 556, 86 S.Ct. 1045, 16 L.Ed.2d 84. In a series of cases, the court addressed that concern.

{¶ 71} Although the court had recognized a due process interest in juvenile court proceedings as early as 1948, see *Haley v. Ohio* (1948), 332 U.S. 596, 601, 68 S.Ct. 302, 92 L.Ed. 224, the understanding that the Due Process Clause of the Fourteenth Amendment applied to juvenile proceedings because of the juvenile's liberty interests was more fully developed in *Kent* (recognizing that "the admonition to function in a 'parental' relationship is not an invitation to procedural arbitrariness" and holding that a juvenile is entitled to a hearing on the issue of whether juvenile court jurisdiction should be waived before being released to a criminal court for prosecution), and crystallized in *In re Gault* (1967), 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527.

{¶ 72} *Gault* approvingly quoted the report of the President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society (1967) 86–86, which recommended that counsel be appointed to juveniles " 'as a matter of course' " and observed that " '[t]he most informal and well-intentioned of judicial proceedings are technical; few adults without legal training can influence or even understand them.' " 387 U.S. at 38–39, 87 S.Ct. 1428, 18 L.Ed.2d 527, fn. 65. The court held that a juvenile and his parents must be informed of certain rights, including the juvenile's right to be represented by counsel and to have counsel appointed if his family cannot afford an attorney, the right not to be forced to incriminate himself, the right to written notice of the specific charges against him, and the right to confront and cross-examine witnesses. Id. at 31–56, 87 S.Ct. 1428, 18 L.Ed.2d 527. Soon thereafter, the court also recognized that the Due Process Clause required the state to prove beyond a reasonable doubt the charges against a juvenile. *In re Winship* (1970), 397 U.S. 358, 367–368, 90 S.Ct. 1068, 25 L.Ed.2d 368.

{¶ 73} In the wake of *Gault* and its progeny, we also found that "numerous constitutional safeguards normally reserved for criminal prosecutions are equally

applicable to juvenile delinquency proceedings," *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 26, and overruled prior decisions that held to the contrary, see *In re Agler*, 19 Ohio St.2d at 76, 48 O.O.2d 85, 249 N.E.2d 808.

{¶ 74} As a result of those cases, juveniles secured more of the rights afforded to adults, and juvenile court proceedings became more formal. *Hanning*, 89 Ohio St.3d at 89, 728 N.E.2d 1059. Although some suggest that those changes, and the revisions to the juvenile delinquency laws themselves, indicate a criminalization of juvenile law, see, e.g., *In re Anderson* (2001), 92 Ohio St.3d 63, 66, 748 N.E.2d 67, fn. 2, we have found, see, e.g., *Hanning*, 89 Ohio St.3d at 89–90, 728 N.E.2d 1059, that the General Assembly has adhered to the core tenets of the juvenile system even as it has made substantive changes to the Juvenile Code in a get-tough response to increasing juvenile caseloads, recidivism, and the realization that the harms suffered by victims are not dependent upon the age of the perpetrator. *Schall v. Martin* (1984), 467 U.S. 253, 264–265, 104 S.Ct. 2403, 81 L.Ed.2d 207; *Breed v. Jones* (1975), 421 U.S. 519, 536, 95 S.Ct. 1779, 44 L.Ed.2d 346.

{¶ 75} Despite the inherent tension in the juvenile court system between the goals of juvenile rehabilitation and protection of society, the Supreme Court has suggested that the system should remain. "[O]ur decisions in recent years have recognized that there is a gap between the originally benign conception of the system and its realities. * * * That the system has fallen short of the high expectations of its sponsors [however] in no way detracts from the broad social benefits sought or from those benefits that can survive constitutional scrutiny." *Breed*, 421 U.S. at 528–529, 95 S.Ct. 1779, 44 L.Ed.2d 346. Contemporary juvenile courts thus remain " 'an uneasy partnership of law and social work.' " *In re Agler*, 19 Ohio St.2d at 73, 48 O.O.2d 85, 249 N.E.2d 808, quoting Whitlatch, The Juvenile Court (1967), 18 W.Res.L.Rev. 1239, 1244–1245. We, too, abide by the principles that underlie the founding of the juvenile courts, but we do so with pragmatism and an understanding of modern realities.

{¶ 76} For example, although we often characterize juvenile proceedings as civil rather than criminal, *Cope v. Campbell* (1964), 175 Ohio St. 475, 26 O.O.2d 88, 196 N.E.2d 457, paragraph one of the syllabus; *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 25, we recognize that "[w]hatever their label, juvenile delinquency laws feature inherently criminal aspects that we cannot ignore," id. at ¶ 26, citing *Anderson*, 92 Ohio St.3d at 65–66, 748 N.E.2d 67. See also *In re Gault*, 387 U.S. at 23–25 and 50, 87 S.Ct. 1428, 18 L.Ed.2d 527 (noting the term "delinquent" offers only slightly less stigma than the term "criminal" and that a "commitment" is an incarceration regardless of what it is labeled); *In re Winship*, 397 U.S. at 365–366, 90 S.Ct. 1068, 25 L.Ed.2d 368 ("civil labels and

good intentions do not themselves obviate the need for criminal due process safeguards in juvenile courts"). "[J]uvenile delinquency laws feature inherently criminal aspects," and the state's goals in prosecuting a criminal action and in adjudicating a juvenile delinquency case are the same: "to vindicate a vital interest in the enforcement of *criminal* laws." (Emphasis sic.) *Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 26.

{¶ 77} Given the state's valid interests in enforcing its criminal laws against juveniles and, in at least some cases, in requesting that the juvenile court impose significant penalties in their dispositions, we must also remain cognizant of the nature of the juvenile's right to representation by counsel.

{¶ 78} In declaring that the juvenile facing commitment to an institution has a right to counsel " 'at every step in the proceedings against him,' " *In re Gault*, 387 U.S. at 36, 87 S.Ct. 1428, 18 L.Ed.2d 527, quoting *Powell v. Alabama* (1932), 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158, the Supreme Court reinforced its belief that the appointment of counsel for a juvenile is not a mere formality or "a grudging gesture to a ritualistic requirement"; it is a venerable right at the core of the administration of justice and due process. *Kent*, 383 U.S. at 561, 86 S.Ct. 1045, 16 L.Ed.2d 84.

{¶ 79} Indeed, it was the understanding of the right to due process that drove the court's holdings in *Kent, Gault*, and *Winship*. Those cases make clear that the right to counsel in a juvenile case flows to the juvenile through the Due Process Clause of the Fourteenth Amendment, not the Sixth Amendment. *Gault*, 387 U.S. at 41, 87 S.Ct. 1428, 18 L.Ed.2d 527. And although modern juvenile proceedings share some indicia of the criminal courts, juvenile proceedings are not considered criminal prosecutions for purposes of Sixth Amendment analyses. *McKeiver*, 403 U.S. at 553, 91 S.Ct. 1976, 29 L.Ed.2d 647.

{¶ 80} Because the juvenile's right to counsel is predicated on due process, it is malleable rather than rigid. As the Supreme Court has explained, "For all its consequence, 'due process' has never been, and perhaps can never be, precisely defined. * * * [D]ue process 'is not a technical conception with a fixed content unrelated to time, place and circumstances.' *Cafeteria [& Restaurant ] Workers [Union] v. McElroy* [1961], 367 U.S. 886, 895 [81 S.Ct. 1743, 6 L.Ed.2d 1230]. Rather, the phrase expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake." *Lassiter v. Dept. of Social Servs. of Durham Cty., North Carolina* (1981), 452 U.S. 18, 24–25, 101 S.Ct. 2153, 68 L.Ed.2d 640.

{¶ 81} The flexibility of due process lies in its scope after it has been determined that some process is due, and due process doctrine recognizes that "not all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey v. Brewer* (1972), 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484. A court's task is to ascertain what process is due in a given case, *McKeiver*, 403 U.S. at 541, 91 S.Ct. 1976, 29 L.Ed.2d 647, while being true to the core concept of due process in a juvenile case—to ensure orderliness and fairness. We proceed in our analysis with that understanding at the fore.

{¶ 82} The fact that the right to counsel in a juvenile case arises from due process does not diminish its importance. A juvenile typically lacks sufficient maturity and good judgment to make good decisions consistently and sufficiently foresee the consequences of his actions. See, e.g., *Roper v. Simmons* (2005), 543 U.S. 551, 569–570, 125 S.Ct. 1183, 161 L.Ed.2d 1; *Planned Parenthood of Cent. Missouri v. Danforth* (1976), 428 U.S. 52, 102, 96 S.Ct. 2831, 49 L.Ed.2d 788 (Stevens, J., concurring in part and dissenting in part). Thus, "[t]he juvenile needs the assistance of counsel to cope with problems of law, to make skilled inquiry into the facts, to insist upon regularity of the proceedings and to ascertain whether he has a defense and to prepare and submit it." (Footnote omitted.) *Gault*, 387 U.S. at 36, 87 S.Ct. 1428, 18 L.Ed.2d 527.

{¶ 83} Given the importance of counsel in juvenile proceedings, the General Assembly codified a juvenile's constitutional right to appointed counsel in the wake of *Gault*. Indeed, through R.C. 2151.352, the legislature provided a statutory right to appointed counsel that goes beyond constitutional requirements. *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110, ¶ 15, citing *State ex rel. Asberry v. Payne* (1998), 82 Ohio St.3d 44, 46, 693 N.E.2d 794.

{¶ 84} Former R.C. 2151.352 provided that a child "is entitled to representation by legal counsel at all stages of the proceedings * * * and if, as an indigent person, any such person is unable to employ counsel, to have counsel provided for the person." The statute mandated that "[i]f a party appears without counsel, the court shall ascertain whether the party knows of the party's right to counsel and of the party's right to be provided with counsel if the party is an indigent person." The statute further provides, "Counsel must be provided for a child not represented by the child's parent, guardian, or custodian. If the interests of two or more such parties conflict, separate counsel shall be provided for each of them." Am.Sub.S.B. No. 179, 148 Ohio Laws, Part IV, 9519, effective January 1, 2002. (The current version is substantively similar; the last three quoted sentences are exactly the same.)

{¶ 85} We have also incorporated constitutional safeguards in our rules of procedure. According to Juv.R. 4(A), "[e]very party shall have the right to be

represented by counsel and every child * * * the right to appointed counsel if indigent." Similarly, Juv.R. 29(B) mandates that "[a]t the beginning of the hearing," the court inform unrepresented parties of their rights to counsel. Juv.R. 29(B)(3). The rules also recognize that, like an adult, a juvenile may waive his right to counsel. Juv.R. 3; Juv.R. 29(B)(3) and (4). This case directly implicates R.C. 2151.352's requirement that "[c]ounsel must be provided for a child not represented by the child's parent" and those requirements that arise from the application of Juv.R. 29(D) to that right.

{¶ 86} C.S. avers that the fifth sentence of R.C. 2151.352 (the fourth of former R.C. 21512.352)—which states that "[c]ounsel must be provided for a child not represented by the child's parent, guardian, or custodian"—offends his constitutional right to counsel. The crux of C.S.'s claim is that the statute implicitly, and improperly, permits a child's parent (or guardian or custodian) to substitute for an attorney in juvenile court proceedings. He argues that the juvenile's right to counsel "as provided by the Sixth Amendment to the United States Constitution and Section Ten, Article One of the Ohio Constitution is fundamental" and cannot be satisfied by any "representation" by the child's parent. He also contends that the statute cannot be construed as creating a nonwaiveable right to counsel and that the fifth sentence must therefore be severed from the statute.

{¶ 87} C.S.'s theory of the statute's unconstitutionality entails a binary analysis. The first prong of his contention is that the statute requires that counsel *must* be appointed for the juvenile and that the right cannot be waived if the child is not represented by a parent, guardian, or custodian. The second prong of the attack asserts that the statute therefore conflicts with Juv.R. 3, which provides that the "rights of a child * * * may be waived." He argues that this perceived conflict—between a right that cannot be waived per R.C. 2151.352 and a right that can be waived per Juv.R. 3—has led to divergent results in the courts, some of which have found that a parent, custodian, or guardian, rather than an attorney, can represent the juvenile.

{¶ 88} In reading the statute, we must consider the definition of "represent," giving effect to the usual, normal, and customary meaning of the word, R.C. 1.42, and being faithful to the language of and legislative intent behind the statute, *State v. S.R.* (1992), 63 Ohio St.3d 590, 594, 589 N.E.2d 1319.

{¶ 89} Taken alone, the ordinary use of the word "represent" does not necessarily shed light on its intended meaning in this context. At the time the statute was enacted, as now, the word "represent" had myriad meanings: "[t]o act for," "[t]o stand in the place of," Ballantine's Law Dictionary (3d Ed.1969) 1095, or "to exhibit; to expose before the eyes," or "to stand in his place; to supply his place; to act as his substitute," Black's Law Dictionary (4th Ed.1968)

1465. We believe, however, that the legislature's use of the word is clearer when taken in its constitutional context.

{¶ 90} As C.S. acknowledges in his brief, "the General Assembly's intent in enacting [the fifth sentence of the statute] was to protect the parties' due process rights in juvenile court in accordance with the then-recently issued decision, *In re Gault* [1967], 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527." Clearly, the General Assembly's general intent in enacting R.C. 2151.352 was to ensure the juvenile's constitutional right to representation by an attorney—not representation by a parent, custodian, or guardian.

{¶ 91} In enacting this statute, we presume, the General Assembly was mindful of the common law. Cf. *Meyer v. Holley* (2003), 537 U.S. 280, 285, 123 S.Ct. 824, 154 L.Ed.2d 753. Because the common law does not permit parents to appear pro se on behalf of their minor children in civil cases,[1] see, e.g., *Shepherd v. Wellman* (C.A.6, 2002), 313 F.3d 963, 970–971, a fortiori, the common law would not permit parents to act pro se on behalf of their children in a delinquency case.

{¶ 92} Moreover, at the time it enacted R.C. 2151.352, the Ohio legislature was well aware that this court has the exclusive authority to regulate, control, and define the practice of law, including prohibitions on lay representation, see *In re Unauthorized Practice of Law in Cuyahoga Cty.* (1963), 175 Ohio St. 149, 151, 23 O.O.2d 445, 192 N.E.2d 54, that we had held that "no one, other than an attorney, may appear in court as a representative of another, whether or not such representative is to receive a fee for his services," id., and that we had defined the practice of law as including representation before a court, as well as other tasks, including "all advice to clients and all actions taken for them in matters connected with the law," *Land Title Abstract & Trust Co. v. Dworken* (1934), 129 Ohio St. 23, 1 O.O. 313, 193 N.E. 650, at paragraph one of the syllabus. We did not then, and we do not now, countenance a parent who is not an attorney representing a child in court in the capacity of counsel.[2]

---

1. The United States Supreme Court recently held that parents may act pro se when prosecuting claims arising from the Individuals with Disabilities Education Act ("IDEA"), Section 1400 et seq., Title 20, U.S.Code. *Winkelman v. Parma City School Dist.* (2007), ___ U.S. ___, 127 S.Ct. 1994, 167 L.Ed.2d 904. The court's holding, however, was based on the unique, comprehensive statutory scheme created by the IDEA, which confers independent rights on parents that they may attempt to enforce by prosecuting IDEA claims on their own behalf. ___ U.S. at ___, ___, 127 S.Ct. at 2002, 2006, 167 L.Ed.2d 904. We are not presented with an analogous statutory scheme, or with one that shows a clear legislative intent to supplant the common-law proscription against third-party representation, including representation of a child by a parent who is not an attorney.

2. To the extent that our courts of appeals have found that parents can adequately represent their children in a legal sense in delinquency proceedings, see, e.g., *In re Estes,* Washington App. No. 04CA11, 2004-Ohio-5163, 2004 WL 2260510, we expressly reject those holdings.

{¶ 93} Indeed, "[i]t has long been recognized that the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson* (1970), 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763, fn. 4. Most parents are not attorneys and will not be able to provide effective counsel because they are not trained in the law. See *Gault*, supra; *Johnson v. Zerbst* (1938), 304 U.S. 458, 462–463, 58 S.Ct. 1019, 82 L.Ed. 1461; *Powell v. Alabama* (1932), 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158; *In re Manuel R.* (1988), 207 Conn. 725, 739, 543 A.2d 719. Because even the best-intentioned parents will lack the skill and familiarity with law and procedure to adequately represent their children in delinquency proceedings, they may not do so.

{¶ 94} But that conclusion does not mean that we do not recognize the important role that a parent plays in the juvenile court process. In *Gault*, the court quoted a portion of the President's Crime Commission's Report: " 'The presence of an independent legal representative of the child, *or of his parent*, is the keystone of the whole structure of guarantees that a minimum system of procedural justice requires.' " (Emphasis added.) 387 U.S. at 39, 87 S.Ct. 1428, 18 L.Ed.2d 527, fn. 65. The General Assembly was also aware of the Supreme Court's recognition of the importance of parental involvement in delinquency cases.

{¶ 95} We believe that the fifth sentence of the statute reflects the General Assembly's understanding that *Gault* held that the juvenile may waive his rights, including his right to counsel, see *Gault*, 387 U.S. at 41–42, 87 S.Ct. 1428, 18 L.Ed.2d 527, and that it codifies that right of waiver but only if the juvenile is advised by a parent in considering waiver. The Second District's assessment of the statute in *In re R.B.*, 166 Ohio App.3d 626, 2006-Ohio-264, 852 N.E.2d 1219, is similar.

{¶ 96} There, the court of appeals found that the provision meant that "[i]f a child appears before the court who is not represented by the child's parent, guardian, or custodian, then the trial court 'must' provide counsel. Only if the child has some adult to advise him may the child knowingly and voluntarily waive his right to counsel. That construction of the statute serves an apparent purpose of assuring that a child's waiver of the right to counsel is knowing and voluntary, and it reconciles the quoted provisions, giving meaning to each." Id. at ¶ 25. The Second District's approach is consistent with the holdings of other states' appellate courts in cases interpreting similar statutory language. *In re D.S.* (N.D.1978), 263 N.W.2d 114, 120 ("We conclude * * * that [statutory language stating that '[c]ounsel must be provided for a child not represented by his parent, guardian, or custodian'] imposes a mandatory duty to provide counsel for a child at all stages of the proceedings under the Uniform Juvenile Court Act providing the child is not represented by his parent, guardian, or custodian [and that] this

right to counsel cannot be waived by a child who is not represented by his parent, guardian, or custodian"); *A.C.G. v. State* (1974), 131 Ga.App. 156, 205 S.E.2d 435 ("The [juvenile's] right to counsel may be waived, however, unless the child is 'not represented by his parent, guardian, or custodian' ").

{¶ 97} We are also persuaded by the reasoning of the Supreme Court of Connecticut in its rejection of the notion of nonwaiver. As that court noted, "a per se rule of nonwaivability might actually frustrate a principal goal of juvenile law of encouraging children to accept responsibility for their transgressions and take an active role in their rehabilitation. * * * Without minimizing the significance of this inevitable tension [between the juvenile courts' roles of protecting society and nurturing and rehabilitating juveniles], we are persuaded that allowing a child to make an informed and deliberate choice about legal representation, if properly supervised by the trial court, can advance both the goal of control and that of treatment. * * * To mandate the presence of counsel * * * might serve to reduce the child's own sense of involvement and might enhance his perception of his own role as merely that of spectator. * * * [W]e believe that the waiver of counsel decision, *in itself,* can be a significant rehabilitative moment for the child." (Emphasis sic.) *In re Manuel R.* (1988), 207 Conn. 725, 734–736, 543 A.2d 719.

{¶ 98} We hold that the word "represent" in the fifth sentence of R.C. 2151.352 means to counsel or advise the juvenile in a delinquency proceeding. We further hold that in a delinquency proceeding, a juvenile may waive his constitutional right to counsel, subject to certain standards articulated below, if he is counseled and advised by his parent, custodian, or guardian. If the juvenile is not counseled by his parent, guardian, or custodian and has not consulted with an attorney, he may not waive his right to counsel.

{¶ 99} In a delinquency case, a judge, acting as parens patriae, has the inherent authority to appoint counsel for the juvenile to determine whether he should waive his rights. We decline, however, to require a judge to do so in each case.[3]

{¶ 100} In light of the sixth sentence of R.C. 2151.352, we hold that a judge must appoint counsel for a juvenile if there is a conflict between the juvenile and

3. In essence, the fifth sentence of R.C. 2151.352 is an "independent advice/interested adult" standard that we have declined to adopt, absent legislative action, in other circumstances. See, e.g., *In re Watson* (1989), 47 Ohio St.3d 86, 89–90, 548 N.E.2d 210. Though there may be a number of policy reasons to support the legislative imposition of a bright-line rule requiring a juvenile to consult with an attorney before waiving his constitutional rights, see, e.g., Minnesota Juv.Delinquency Proc.R. 3.04(1); *State ex rel. J.M. v. Taylor* (1981), 166 W.Va. 511, 276 S.E.2d 199, we do not believe that it is required by the Due Process Clause of the United States Constitution.

his parent, custodian, or guardian on the question of whether counsel should be waived. Accord *United States v. M.I.M.* (C.A.1, 1991), 932 F.2d 1016, 1018–1019. In so doing, we recognize that no case in Ohio has held that a parent can waive the constitutional right of a juvenile in a delinquency proceeding, see *In re C.A.C.*, 2d Dist. Nos. 2005–CA–134 and 2005–CA–135, 2006-Ohio-4003, 2006 WL 2219570, ¶ 48, and we make clear that no parent has that authority.

{¶ 101} Our holdings here comport with similar decisions in other state courts that have addressed this issue, with Juv.R. 3 (which expressly countenances waiver) and with the precepts of *Gault*, which were concerned with the fundamental fairness of juvenile proceeding for all parties concerned, including the juvenile, his parents, and the state.

{¶ 102} In rendering our decision, we reinforce the vital role a parent can play in a delinquency proceeding.

{¶ 103} "The law's concept of the family rests on the presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham v. J.R.* (1979), 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101. *Gault* itself presented such a scenario, with a mother who was engaged fully in securing her child's best interests and whom the court recognized could help her son determine whether to waive his rights. See 387 U.S. at 42, 87 S.Ct. 1428, 18 L.Ed.2d 527. The value of the parent in such decision-making remains today in Ohio's juvenile courts, as juveniles decide whether to waive their right to counsel.

{¶ 104} Having determined that the right to counsel may be waived, we must determine the indicia of a valid waiver.

{¶ 105} In holding that the constitutional right to counsel may be waived by a juvenile, we apply the definition of waiver used in *State v. Foster*—an "intentional relinquishment or abandonment of a known right." 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, at ¶ 31. As in cases involving adults, there is a strong presumption against waiver of the constitutional right to counsel. *Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461.

{¶ 106} An effective waiver of the right to counsel by a juvenile must be voluntary, knowing, and intelligent. *State v. Gibson* (1976), 45 Ohio St.2d 366, 74 O.O.2d 525, 345 N.E.2d 399, paragraph one of the syllabus. In a juvenile court proceeding in which the judge acts as parens patriae, the judge must scrupulously ensure that the juvenile fully understands, and intentionally and intelligently relinquishes, the right to counsel. Id. at paragraph two of the syllabus; see, also, *State v. Davis* (1978), 56 Ohio St.2d 51, 54, 10 O.O.3d 87, 381 N.E.2d 641; *Von Moltke v. Gillies* (1948), 332 U.S. 708, 722, 68 S.Ct. 316, 92 L.Ed. 309 ("It is the solemn duty of a federal judge before whom a defendant appears without counsel to make a thorough inquiry and to take all steps necessary to insure the fullest

protection of this constitutional right at every stage of the proceedings"); *In re Manuel R.*, 207 Conn. at 737–738, 543 A.2d 719 ("It is now commonly recognized that courts should take 'special care' in scrutinizing a purported confession or waiver by a child"), citing *Haley,* 332 U.S. at 599, 68 S.Ct. 302, 92 L.Ed. 224.

{¶ 107} In the discharge of that duty, the judge is to engage in a meaningful dialogue with the juvenile. Instead of relying solely on a prescribed formula or script for engaging a juvenile during the consideration of the waiver, see *Iowa v. Tovar* (2004), 541 U.S. 77, 88, 124 S.Ct. 1379, 158 L.Ed.2d 209, the inquisitional approach is more consistent with the juvenile courts' goals, and is best suited to address the myriad factual scenarios that a juvenile judge may face in addressing the question of waiver.

{¶ 108} We agree with the Supreme Court of Nebraska's recent holding that a totality-of-the-circumstances analysis is the proper test to be used in ascertaining whether there has been a valid waiver of counsel by a juvenile. *In re Dalton S.* (2007), 273 Neb. 504, 514, 730 N.W.2d 816. See, also, *Fare v. Michael C.* (1979), 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (applying totality-of-circumstances test to juvenile's waiver of rights). The judge must consider a number of factors and circumstances, including the age, intelligence, and education of the juvenile; the juvenile's background and experience generally and in the court system specifically; the presence or absence of the juvenile's parent, guardian, or custodian; the language used by the court in describing the juvenile's rights; the juvenile's conduct; the juvenile's emotional stability; and the complexity of the proceedings. *In re Dalton S.*, 273 Neb. at 515, 730 N.W.2d 816. Accord *Michael C.*, 442 U.S. at 725, 99 S.Ct. 2560, 61 L.Ed.2d 197.

{¶ 109} In cases such as this one, in which a juvenile is charged with a serious offense, the waiver of the right to counsel must be made in open court, recorded, and in writing. Cf. *State v. Brooke,* 113 Ohio St.3d 199, 2007-Ohio-1533, 863 N.E.2d 1024, paragraph two of the syllabus. If a written waiver has been executed, the juvenile court judge must consider the form used and the juvenile's literacy level to ensure that the juvenile has an intelligent understanding of the document and an appreciation of the gravity of signing it. See, e.g., *In re Shane* (Jan. 26, 2001), Darke App. No. 1523, 2001 WL 62550, *3.

{¶ 110} Though it is not dispositive, a key factor in the totality of the circumstances is the degree to which the juvenile's parent is capable of assisting and willing to assist the juvenile in the waiver analysis. See *Huff v. K.P.* (N.D.1981), 302 N.W.2d 779, 782. The juvenile court judge must be aware that not all parents may sufficiently counsel and advise, that is, "represent," their child in a delinquency proceeding.[4]

---

4. In some cases, a parent's failure to advocate for her child may arise from misguided Solomonic wisdom, see, e.g., *In re Johnston* (2001), 142 Ohio App.3d 314, 319, 755 N.E.2d 457 (juvenile's

{¶ 111} The juvenile court judge must be guided by Juv.R. 29 in the process of considering a waiver of counsel and in accepting an admission. Juv.R. 29(B) mandates that the juvenile court judge must advise a juvenile, at the commencement of the adjudicatory hearing, of certain rights, including the rights to counsel. Juv.R. 29(D) further mandates that before an admission can be accepted, the juvenile court judge must be satisfied that the admission is voluntarily made with the understanding of the nature of the allegations and the consequences of the admission and that by entering the admission, the juvenile is waiving the rights to confront witnesses and challenge evidence, to remain silent, and to introduce his own evidence.

{¶ 112} As many Ohio courts of appeals recognize, "An admission in a juvenile proceeding, pursuant to Juv.R. 29, is analogous to a guilty plea made by an adult pursuant to Crim.R. 11 in that both require that a trial court personally address the defendant on the record with respect to the issues set forth in the rules." *In re Smith*, Union App. No. 14–05–33, 2006-Ohio-2788, 2006 WL 1519688. But see *State v. Penrod* (1989), 62 Ohio App.3d 720, 723, 577 N.E.2d 424 ("Juv.R. 29 has no counterpart in the Criminal Rules"). Because of the similarity between Juv.R. 29 and Crim.R. 11, and because we have held that only substantial compliance with the text of Crim.R. 11 is necessary, *State v. Nero* (1990), 56 Ohio St.3d 106, 108, 564 N.E.2d 474, most courts of appeals have held that only substantial compliance with Juv.R. 29 is needed. See, e.g., *In re C.P.*, Lorain App. No. 04CA008534, 2005-Ohio-1819, 2005 WL 901209, ¶ 8; *In re Bays*, Greene App. Nos. 2002–CA–52 and 2002–CA–56, 2003-Ohio-1256, 2003 WL 1193787, ¶ 7 ("While the failure to inform a juvenile of her rights under Juv.R. 29(B) constitutes reversible error, this court has required only substantial compliance with the rule"). We agree.

{¶ 113} We hold that in a juvenile delinquency case, the preferred practice is strict compliance with Juv.R. 29(D). We further hold, however, that if the trial court substantially complies with Juv.R. 29(D) in accepting an admission by a juvenile, the plea will be deemed voluntary absent a showing of prejudice by the juvenile or a showing that the totality of the circumstances does not support a

---

mother agreed to pay for child's counsel, but left the task of finding and retaining counsel entirely to her 16–year–old son), while in others, it may be virtually impossible to advocate effectively for the child because of parental responsibilities to the juvenile's victims, see, e.g., *In re Slider*, 160 Ohio App.3d 159, 2005-Ohio-1457, 826 N.E.2d 356, because the parent herself is a victim, or the parent is otherwise in an antagonistic capacity, cf. *In re C.A.C.*, Clark App. Nos. 2005–CA–134, 2005–CA–135, 2006-Ohio-4003, 2006 WL 2219570, ¶ 42, or has "her own agenda, or [is] advocating her own best interest, which may or may not also be the child's." *In re Howard* (1997), 119 Ohio App.3d 201, 206, 695 N.E.2d 1. In such circumstances, there is no fundamental fairness in permitting the parent to represent the child, even in the limited capacity of determining whether to waive counsel.

finding of a valid waiver. For purposes of juvenile delinquency proceedings, substantial compliance means that in the totality of the circumstances, the juvenile subjectively understood the implications of his plea.

{¶ 114} We believe that our holdings here reflect and reinforce the constitutional right to counsel that flows properly to the juvenile in a delinquency case, while being true to the General Assembly's intent in enacting R.C. 2151.352.

{¶ 115} Taken together, R.C. 2151.352 and Juv.R. 29 serve as meaningful guideposts by which the juvenile courts' judges must determine whether the due process rights from which the right to counsel arises have been satisfied in a given case. In so holding, we remain faithful to the historical goals and aspirational ideals that gave rise to Ohio's juvenile courts while recognizing the modern realities in which those courts must function.

{¶ 116} We now turn to the facts of this case.

{¶ 117} Although the magistrate secured representations from C.S. and his mother that they had signed the "rights papers," the record is not clear as to the knowingness of the waiver and the intelligent relinquishment of rights. At the time C.S. waived his rights, with his mother's assent, there were clear portents of additional, significant charges that would have been felony offenses had they been committed by an adult. In fact, after C.S. had waived counsel, the magistrate specifically mentioned the possibility that additional felony charges could be forthcoming.

{¶ 118} There is ample evidence in the record to suggest that from the time C.S. first spoke to police until he waived his right to counsel in the courtroom, his focus was on being committed so that he could be close to his older brother, who had previously been committed to the custody of the Department of Youth Services. His rationale for the admission cannot be said to be intelligent, as evidenced by the judge's conclusion that the two youths should not be housed together.

{¶ 119} An important aspect of our consideration in this case is our concern that there was not any meaningful advice rendered to C.S. in his decision to waive counsel. We acknowledge that an inference can be drawn that this family, through its past dealings with the juvenile courts, may have had an understanding of the process in which C.S. was engaged. But we are not satisfied that there was a sufficient showing that Ms. S. was in a position to render any meaningful advice to her son in this case.

{¶ 120} Ms. S. had not spoken with her son since his arrest, and she had not had an opportunity to read the police report detailing his prodigious criminal activity before agreeing that he should waive his right to legal counsel. The magistrate did not ask about those facts until after he had secured the waiver of

counsel and accepted C.S.'s admissions. We would not condone an attorney's failure to meet with a client prior to advising him to waive his rights to counsel or appearing before a judge for a plea hearing, and we are not satisfied that any meaningful advice was offered by Ms. S. in this matter.

{¶ 121} Ms. S.'s only inquiry during the hearing related not to the evidence against her son, to the controlling law, or to her son's rights. Rather, like her son, she was focused on whether C.S. could be placed in the same facility in which his brother was housed. Her focus on the place of confinement was not based on the services available to her son in a particular facility but, rather, on a pragmatic concern: her means of transportation were limited, and it would be easier for her to visit her children if they were in the same institution.

{¶ 122} In the circumstances before us, we are not persuaded that the waiver of counsel was valid. We thus vacate the court of appeals' judgment to the extent that it held that there was a sufficient showing of a valid waiver of counsel, and we remand the cause to the juvenile court. In so doing, we do not intimate any opinion on the disposition rendered by the magistrate.

{¶ 123} We recognize that this case presents one of the difficult ones for a juvenile court. Despite his youth, C.S. has a significant history of alcohol and drug abuse, violence, and other behaviors that are destructive both to himself and to the community. He is on a collision course with tragedy. The magistrate's clear frustration with C.S., and with the limits of the juvenile court system, is understandable, as is a significant period of incarceration. See *McKeiver*, 403 U.S. at 546, 91 S.Ct. 1976, 29 L.Ed.2d 647, fn. 6, quoting the President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Juvenile Delinquency and Youth Crime (1967) 9 ("What should distinguish the juvenile from the criminal courts is greater emphasis on rehabilitation, not exclusive preoccupation with it"). But that frustration, and the judge's broad discretion in imposing disposition, cannot override the need for the careful consideration of the fairness and due process rights that *Gault* demands and the application of those principles in all delinquency cases.

> Judgment reversed
> and cause remanded.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, and CUPP, JJ., concur.

O'DONNELL and LANZINGER, JJ., dissent.

---

**O'DONNELL, J., dissenting.**

{¶ 124} I concur with the analysis offered by Justice Lanzinger in her well-reasoned dissent. The majority opinion here correctly sets forth that the case

should be analyzed using a totality-of-the-circumstances test. However, in my view, the majority reaches an improper conclusion by giving undue weight to the mother's expressed desire to have both of her children housed in the same juvenile facility.

{¶ 125} The majority opinion, I think, invades the province of a parent's role in raising his or her child. In rearing a child, parents are called upon to make all important decisions regarding their child's growth and development. Those decisions have significant repercussions in every aspect of that child's life— enrollment in school, provision of medical and dental care, participation in athletic or other activities, religious affiliation, and a host of other relevant and meaningful issues involving medical, moral, social, legal, and other decision-making.

{¶ 126} Nothing in the record before us suggests incompetence or failure of this mother to act in the best interests of her child in this instance. The majority's overemphasis on the mother's desire to have her two children housed in a single penal facility leads to an improper outcome here. For these reasons, I concur with the opinion of Justice Lanzinger.

---

LANZINGER, J., dissenting.

{¶ 127} I would affirm the judgment of the Licking County Court of Appeals with respect to its holding that there was a sufficient showing of the valid waiver of counsel in this case.

{¶ 128} The record reveals that C.S. acknowledged reading and signing a form that included the statement "You have the right to be represented by an attorney at all stages of this proceeding" and informed him that an attorney will be appointed if "you cannot afford an attorney and you qualify under State guidelines." The waiver of attorney that C.S. and his mother signed stated, "The undersigned have read the instructions concerning our right to an attorney and the right to a Court-appointed attorney, if applicable. Knowing and understanding these rights, we hereby waive our right to be represented by an attorney or Court-appointed attorney. We further understand that we can be represented by an attorney in the future simply by advising the Court of our intention to do so." During a colloquy with the magistrate regarding his rights, C.S. answered "yes" to the question "Do you understand that?" at least nine times. The magistrate in juvenile court determined that a valid waiver of counsel was made in accepting the plea.

{¶ 129} Despite this record of the proceedings, the majority holds that the waiver of counsel was invalid because C.S.'s mother was not "in a position to

render any meaningful advice to her son," even though she was present at the delinquency adjudication hearing. Majority opinion at ¶ 119. This conclusion stems from one sentence in R.C. 2151.352.

{¶ 130} The words that the majority focuses on are "Counsel must be provided for a child not represented by the child's parent, guardian, or custodian." R.C. 2151.352 is a statute that relates to all juvenile proceedings, not simply delinquency adjudications. The sentence merely explains that counsel must be available (i.e., be provided) at a juvenile proceeding if a child's parent, guardian, or custodian is not. There is no question that a juvenile is entitled to representation by legal counsel at all stages of juvenile proceedings. R.C. 2151.352; Juv.R. 4(A). As the majority rightly observes, a juvenile's right to counsel is not the same as the right to be "represented" by a parent, guardian, or custodian. Yet by creating a new requirement that a parent offer "meaningful advice" before a child may waive the right to counsel, the majority seems to consider parental and attorney advice to be equal, at least on the issue of waiver.

{¶ 131} The juvenile rules allow waiver of counsel in juvenile proceedings with consent of the court. Juv.R. 3. At the beginning of an adjudicatory hearing, the juvenile court shall "[i]nform unrepresented parties of their right to counsel and determine if those parties are waiving their right to counsel"; "[a]ppoint counsel for any unrepresented party under Juv.R. 4(A) who does not waive the right to counsel"; and "[i]nform any unrepresented party who waives the right to counsel of the right: to obtain counsel at any stage of the proceedings, to remain silent, to offer evidence, to cross-examine witnesses, and, upon request, to have a record of all proceedings made, at public expense if indigent." Juv.R. 29(B)(3) through (5).

{¶ 132} Before permitting a waiver of counsel, the court has a duty to make an inquiry to determine that the waiver is of "a fully known right" and is voluntarily, knowingly, and intelligently made. In re Gault (1967), 387 U.S. 1, 42, 87 S.Ct. 1428, 18 L.Ed.2d 527. We indicated in In re Agler that the right to counsel is personal to the juvenile. Agler (1969), 19 Ohio St.2d 70, 78, 48 O.O.2d 85, 249 N.E.2d 808. So too then is the corresponding right to waive counsel. The "right to the assistance of counsel implicitly embodies a 'correlative right to dispense with a lawyer's help.'" Faretta v. California (1975), 422 U.S. 806, 814, 95 S.Ct. 2525, 45 L.Ed.2d 562, quoting Adams v. United States ex rel. McCann (1942), 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268.

{¶ 133} I agree that the totality of circumstances should be considered to ascertain the validity of the waiver but disagree with the majority's emphasis on C.S.'s mother's intent. "Meaningful advice" from a parent was not required for a valid waiver until now, and any assistance that C.S.'s mother offered him would have been considered part of the totality of the circumstances the court would

consider in determining whether C.S. validly waived the right to counsel. Nothing in rule or statute requires "a sufficient showing that [the parent is] in a position to render * * * meaningful advice to her son." Majority opinion at ¶ 119. Besides being unnecessary, such an ambiguous standard will be difficult to apply.

{¶ 134} C.S.'s mother's motivation in having her two children placed in the same facility should not invalidate C.S.'s waiver when, as the record shows, he waived his right to counsel and admitted to the charges against him after a colloquy with the judge that occurred in open court.

{¶ 135} I agree with the court of appeals that "[t]he record reflects that appellant's admission to the charges was given knowingly, intelligently, and voluntarily and that the trial court obtained a valid waiver of Appellant's right to counsel." 2006-Ohio-1920, ¶ 59. I therefore respectfully dissent.

O'DONNELL, J., concurs in the foregoing opinion.

--------

David H. Bodiker, Ohio Public Defender, and Amanda J. Powell, Assistant State Public Defender, for appellant.

Robert L. Becker, Licking County Prosecuting Attorney, and Daniel H. Huston, Assistant Prosecuting Attorney, for appellee state of Ohio.

Marsha L. Levick, Mia V. Carpiniello, Jennifer K. Pokempner, Lourdes M. Rosado, and Riya S. Shah, urging reversal for amicus curiae Juvenile Law Center.

Kim Brooks Tandy, urging reversal for amicus curiae Children's Law Center, Inc.

Jeffrey M. Gamso, urging reversal for amici curiae ACLU of Ohio Foundation, American Civil Liberties Union, Children's Defense Fund, and National Association of Counsel for Children.

Yeura R. Venters, urging reversal for amicus curiae Franklin County Public Defender.

Kay Locke, urging reversal for amicus curiae Montgomery County Public Defender.

Emily Hagan, urging reversal for amici curiae Voices for Ohio's Children and Juvenile Justice Coalition.

Linda Julian, urging reversal for amici curiae Juvenile Justice Advocacy Alliance and Alternatives for Youth.

Katherine Hunt Federle and Jason A. Macke, urging reversal for amicus curiae Ohio State University Moritz College of Law Justice for Children Project.

Charles M. Clovis, urging reversal for amicus curiae Ohio Association of Criminal Defense Lawyers.