[Cite as *In re A.L.*, 2020-Ohio-4061.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE  A.L.

A Minor Child

:

:

:

:

:

No. 108862

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:**  August 13, 2020

Civil Appeal from the Cuyahoga County Court of Common Pleas,
Juvenile Division
Case No. DL-18-113184

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and John Hirschauer, Assistant Prosecuting Attorney, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and Britta Barthol, Assistant Public Defender, *for appellant.*

PATRICIA ANN BLACKMON, J.:

{¶ 1} A.L. appeals from the trial court's denial of his motion to suppress and assigns the following errors for our review:

I. The trial court erred in failing to suppress Appellant's statements to the police because they were involuntary and obtained in violation of the right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution.

II. The trial court erred in failing to suppress Appellant's statements to the police because they were obtained without a valid *Miranda* waiver in violation of the privilege against compelled self-incrimination guaranteed by the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

III. The trial court violated Appellant's right to Due Process when it admitted into evidence his statements to the police which were obtained in violation of R.C. 2151.352.

{¶ 2} Having reviewed the record and pertinent law, we reverse the trial court's judgment. The apposite facts follow.

**Facts and Procedural History**

{¶ 3} On September 26, 2018, S.W. was fatally shot multiple times on the stairs of her home at 3280 E. 121st Street in Cleveland. A.L., who is S.W.'s stepson, was present in the house at the time of the shooting, and he placed the call to 911. A.L. was ten years old at the time. Cleveland Police responded to the call, and A.L. told them a man was in the house and shot S.W. Later that day, A.L.'s father, J.A., came home from the hospital where he had been a patient receiving treatment. The police did not interview the father J.A. that day because he was unable to comprehend the questions.

{¶ 4} On October 25, 2018, J.A. told A.L. they were going to a doctor's appointment but instead brought A.L. to the Cleveland Police Homicide Unit for questioning. A.L.'s cousin accompanied them. J.A. and the cousin remained in the lobby area of the police station while two homicide detectives brought A.L. into the interrogation room. The interrogation lasted just under two hours with approximately two minutes of that time spent on A.L.'s *Miranda* rights. At first, A.L. repeated that a heavy-set man in black clothes shot S.W., dropped the gun, and ran outside and down the street. Eventually, however, A.L. told the detectives that "something took over my body" and "I got a feeling like I was in a dream." A.L. further told the detectives that "I didn't even know I did it when I was doing it."

{¶ 5} On October 26, 2018, the state filed a complaint in juvenile court charging A.L. with murder in violation of R.C. 2903.02(A), including one- and three-year firearm specifications. On December 2, 2018, A.L.'s father, J.A., committed suicide.

{¶ 6} On February 19, 2019, A.L. filed a motion to suppress the statements he made to the detectives during the interrogation. The court held a hearing on March 1, 2019, and denied A.L.'s motion. The case was tried to the court, and on June 4, 2019, A.L. was adjudicated delinquent as to murder and the firearm specifications. The court committed A.L. to the Department of Youth Services until the age of 21. It is from the court's denial of his motion to suppress that A.L. appeals.

{¶ 7} On appeal, A.L. argues that the court erred by failing to suppress his statements to the police because they were involuntary, obtained without a valid *Miranda* waiver, and in violation of R.C. 2151.352.

## Motion to Suppress

Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence.

Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

*State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

## Application to Juvenile Proceedings

{¶ 8} "Constitutional principles of due process preclude the use of coerced confessions as fundamentally unfair, regardless of whether the confession is true or false. * * * The same standard applies to adults and juveniles." *State v. Barker,* 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.2d 365, ¶ 31-32. "Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law." *In re Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), quoting *Haley v. Ohio*, 332 U.S. 596, 601, 68 S.Ct. 302, 92 L.Ed. 224 (1948).

## Confessions Must Be Voluntary

{¶ 9} To be admissible in court, a confession must be voluntary. *State v. Chase*, 55 Ohio St.2d 237, 246, 378 N.E.2d 1064 (1978). "The factual question facing the trial court on the motion to suppress was 'whether the defendant's will was

overborne at the time he confessed,' * * * or in other terms, whether his confession was 'made freely, voluntarily, and without compulsion or inducement of any sort * * *.'" *Id.* at 246-247.

> In deciding whether the defendant's confession * * * was involuntarily induced, the court should consider the *totality* of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.

(Emphasis sic.) *State v. Edwards*, 49 Ohio St.2d 31, 40-41, 358 N.E.2d 1051 (1976) (*death penalty vacated on other grounds, Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

{¶ 10} One Ohio court has held that additional factors may be taken into consideration regarding whether a juvenile's statement was given voluntarily, including "whether the juvenile, either before or during questioning, had the opportunity to consult with an adult interested in his welfare; whether the police prevented the juvenile from consulting with a concerned adult; whether the police frustrated an adult's attempt to confer with the juvenile; and the presence of police trickery and deceit." *In re R.L.,* 2d Dist. Montgomery No. 26232, 2014-Ohio-5065, ¶ 25.

{¶ 11} In the case at hand, the court made the following findings when denying A.L.'s motion to suppress. As to the age and mentality of A.L., the court found that he was ten years old at the time of the incident. He was in sixth grade at

St. Adalbert, because he had been "promoted" when he was in first grade[1].

Specifically, the court found that "although A.L. was chronologically ten years old at the time he was interrogated, his intellect and understanding placed him in a higher status. His mentality is displayed during the interrogation wherein he does not demonstrate any difficulty understanding or answering questions."

{¶ 12} As to previous criminal experience, the court found A.L. had no prior involvement with the criminal justice system. However, the juvenile court expanded on this factor in a rather unusual fashion by finding that A.L. had some appreciation for how the criminal justice system worked.

> Yet, when one thinks about criminal experience it is not limited to simply personal involvement in the criminal justice system. A.L. was aware of the interrogation process having watched "First 48." A.L. said "like First 48" to Detective Fishbach when he advised A.L. that the interview would be recorded. The Court will take judicial notice of what "First 48" television show broadcast. "First 48" is a nationally syndicated television show that has two criminal investigations each episode. The titled [sic] of the show is a reflection of the amount of time homicide detectives prefer to gather information in an investigation to ensure a higher probability of solving the case. Routinely, the detectives will interview witnesses and suspects. The suspects are routinely advised of their rights and the suspects will generally speak to the suspects [sic]. There, however, have been many episodes where the suspects refuse to speak to law enforcement and the show ends with the disclaimer "Everyone is deemed innocent until proven guilty in a court of law." Thus, it can be inferred from A.L.'s statement that he is well aware of what transpired in the interrogation room.

{¶ 13} As to the length of the interrogation, at one point in its journal entry, the court found that A.L.'s interrogation lasted 1 hour and 50 minutes, and, at

---

[1] It appears from the record that A.L. skipped one grade because his psychological evaluation states that a typical child his age would be in fifth grade. We note, however, that this "promotion" was self-reported by A.L.

another point in its journal entry, the court found that the interrogation lasted 1 hour and 40 minutes.

{¶ 14} As to the intensity of the interrogation, the court found that the detectives' voices were "monotone and calm," and they did not raise their voices "until more than an hour has elapsed."  The court further found as follows:

> Neither detective is putting words in A.L.'s mouth, but instead they are allowing him to tell them what happened and then summarizing what he said before asking him to explain what happened next.
>
> * * *
>
> At approximately forty-five minutes of the video [Det.] Fishbach[2] [sic] moves his chair inches away from A.L. and again asked him what happened.  A few minutes later Fishbach falsely claims that there are cameras on the homes that are next to and across the street from A.L.'s home.  Fishbach tells A.L. to quit lying and tell the truth.  Next, A.L. appears to get emotional wherein his voice is fainter and it sounds like he's crying when he began discussing hearing the initial shots.  A.L. continued to claim that an unknown male was the person responsible for shooting [S.W.].
>
> Detective Fishbach tells A.L. to tell the truth without saying what the truth is.  He moves closer to A.L. to show him pictures and then taps him twice on the thigh.  Fishbach then says [S.W.'s] mom will feel better and A.L. will feel better if he tells the truth.  Fishbach later asked A.L. does he think God is upset with him for what he did and A.L. said "No, because I didn't do nothing."  Detective Fishbach next stated "Ain't no man did that [A.L.] did that.  And you did that to her and we want to know why."  A.L. responded "I had nothing to do with it.  I didn't do it."
>
> * * *
>
> After an hour and seven minutes Detective Fishbach specifically asked A.L. for the first time "Why did you shoot [S.W.]?"  A few minutes later

---

[2] The detective's name is "Kevin Fischbach"; however, the trial court's journal entry incorrectly spells the detective's last name as "Fishbach."

he raised his voice for the second time when he told A.L. to look at him and that he was not his principal, but instead the police.

{¶ 15} As to physical deprivation and mistreatment, the court found that the detectives gave A.L. a bottle of water and a garbage can. However, "Detective Ford did deny A.L. the request to use the restroom because they were almost finished with the interview."

{¶ 16} As to threats or inducement, the court found that the detectives informed A.L. "that no matter what he tells [them], he's going home with his father * * *."

{¶ 17} Upon review, we find that some of the trial court's findings are not supported by competent, credible evidence in the record. For example, the juvenile court found that the detectives "allow[ed A.L.] to tell them what happened." Our review of the video interrogation does not support this finding. Rather, A.L. repeatedly told the detectives his original version of the events — that a man shot S.W., dropped the gun, and ran away — and it was not until toward the end of the interrogation, after being called a "liar" 19 times by the detectives, that A.L. talked about being in a dream-like state when he "did it."

{¶ 18} Furthermore, we take issue with the juvenile court's finding that, because A.L. has watched the television show "First 48," he understood what transpired in an interrogation room. We see no place for this "finding" in any legal scenario.

{¶ 19} We also note that the juvenile court did not discuss whether A.L.'s will was overborne, whether the police induced or deceived A.L., or the dynamics of whether A.L. consulted with an adult interested in his welfare prior to talking with the police.

{¶ 20} After reviewing the totality of the circumstances, we find that A.L.'s will was overborne by the police interrogation he was subjected to without adult consultation at the age of ten. We further find that the police induced A.L. into confessing after repeatedly telling him to stop lying and asking him if God would approve what he is saying. The police also deceived A.L. by telling him that no matter what happened, he would be going home that day. It is undisputed that A.L. did not go home after the interrogation and has been in custody since that day. Furthermore, the detectives told A.L. that his father consented to him being interrogated. Dr. Fabian, the forensic psychologist who testified for the defense in this case, stated the following: "What I'm concerned about * * * is * * * he may look up to his father to follow his lead that the police is telling him his father consented to him being interrogated and he's following through and believing it's okay. * * * I would say that his age and youthfulness would place him at risk to wanting to please the police."

{¶ 21} Finally, and perhaps most telling, we find that A.L. did not have an opportunity to consult with an adult interested in his welfare prior to the interrogation. A.L.'s father lied to him about going to a doctor appointment, but instead took him to be questioned by homicide detectives at the police department.

A.L.'s father did not go into the interrogation room with A.L., but instead waited for him in the lobby. A.L.'s father was not interested in A.L.'s welfare, and, potentially, had a conflict of interest with his own son. The police gave A.L. inconsistent and, at times, incorrect information about whether A.L.'s father could waive A.L.'s right to an attorney for him. The police also told A.L. at one point that his father had, in fact, already waived that right.

{¶ 22} Accordingly, we find that A.L.'s confession was involuntary and obtained in violation of his constitutional rights. The juvenile court erred by denying his motion to suppress, and A.L.'s first assigned error is sustained.

### Miranda Rights

{¶ 23} A suspect in police custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Without a proper *Miranda* warning, a suspect's statements made during a custodial interrogation are subject to suppression. *State v. Goodwin*, 8th Dist. Cuyahoga No. 99254, 2013-Ohio-4591, ¶ 32. "However, if the suspect voluntarily, knowingly, and intelligently waived his *Miranda* rights before the interrogation, then suppression is inappropriate." *Id.*

{¶ 24} The United States Supreme Court "has emphasized that admissions and confessions of juveniles require special caution." *In re Gault*, 387 U.S. 1, 45, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

> We conclude that the constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults. We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique --- but not in principle --- depending upon the age of the child and the presence and competence of parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.

*Id.* at 55.

{¶ 25} In *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 87, the Ohio Supreme Court held that a suspect may knowingly and intelligently waive his or her *Miranda* rights and agree to make a statement to the police. *Ford* quoted *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), in explaining the two aspects of a *Miranda* waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, quoting *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

{¶ 26} In looking at the totality of the circumstances, courts should evaluate "the juvenile's age, experience, education, background, and intelligence, and * * * whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare* at 725. In *State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, ¶ 24, the Ohio Supreme Court concluded that a "juvenile's access to advice from a parent, guardian or custodian also plays a role in assuring that the juvenile's waiver [of *Miranda* rights] is knowing, intelligent, and voluntary."

{¶ 27} In the case at hand, the juvenile court made the following findings regarding A.L.'s *Miranda* rights, which were displayed on the wall of the interrogation room.

> A.L. then read each warning out loud with little to no difficulty. Detective Fishbach explained each warning after A.L. read it. Fishbach advised A.L. that he did not have to speak to the detectives if he did not want to, even though his father brought him to the police station. Fishbach initially advised A.L. that he was not sure that the warning about "Anything that you say could be used against you in a Court of law," applied to him because of his age, but then moments later said that at some point the warning would apply and anything A.L. says or that the detectives said could be used in Court. Fishbach then incorrectly advises A.L. that his father had the right to waive the presence of an attorney to assist him. Detective Ford then states that it is A.L.'s choice to waive an attorney's presence. A.L. agrees to speak to the detectives without an attorney present.

{¶ 28} In its legal analysis, the juvenile court concluded that A.L. was in custody when he was interrogated and, "despite his youth, did knowingly, intelligently and voluntarily waive his *Miranda* rights." First, the court found that "A.L.'s intellect [sic] capacity is higher than most ten-year olds. His intellectual

testing results place him in the average range of intelligence." Upon review, we find that these two statements are inconsistent.

{¶ 29} To support this conclusion, the juvenile court relied on A.L.'s self-reporting that he skipped a grade, as well as the video interrogation, in which A.L. "was very articulate and able to discuss prior events without any difficulty or challenges." We note, however, that A.L. was evaluated twice for competency to stand trial, and in both of the reports, which were conducted by two different forensic psychologists, the evaluators concluded that A.L. was of average intelligence for a child his age.

{¶ 30} Second, the juvenile court found that A.L. read each right and "answered in the affirmative" when the detectives asked him if he understood each right. "A.L. did not appear to be confused, he did not ask any questions and in fact he responded that he understood." Specifically, the court found that when the detectives misrepresented the law, and then corrected themselves, "[a]gain, A.L. did not ask any follow up questions, he did not indicate that he was confused or that he did not understand the explanation given by the detectives."

{¶ 31} The detectives misrepresented the law to A.L. twice. First, they told him they were unsure if his statements could be used against him in court because he was a juvenile, but "at some point [it] would apply." Second, they told A.L. that his father could waive A.L.'s *Miranda* rights, but that A.L. "would have a say in that as well." The detectives corrected themselves and then told A.L. that this statement was not accurate. The detectives also misrepresented the facts to A.L., telling him

that they had video surveillance footage from the neighbors' houses showing that no man entered or exited the home around the time of the shooting. This video footage does not exist.

{¶ 32} Furthermore, the detectives repeatedly told A.L. he would be going home with his father that day, but A.L. has been in custody since that interrogation. Dr. Fabian testified that A.L. told him that J.A. and S.W. would use corporal punishment to discipline A.L. The day of the shooting, A.L. received a detention at school for not tucking his shirt in. His father and stepmother were aware of this, because A.L. called his father on his way home from school, as was his daily routine. During the interrogation, the detectives repeatedly tried to get A.L. to talk about this and implied that A.L. had a motive to shoot S.W. because he did not want to get a beating that day. The detectives wore A.L. down and ultimately got him to agree that S.W. was either punishing him or about to punish him when he went into a "dream-like" state.

{¶ 33} Furthermore, the juvenile court took into consideration that "Dr. Fabian's assessment indicated that A.L. knew his rights and had a solid understanding of what they meant." Dr. Fabian's assessment also concluded, however, that A.L. did not fully appreciate the consequences of waiving his *Miranda* rights.

> I do have some concerns about [A.L.'s] emotional functioning and his age and lack of emotional maturity, coupled with the nature of the alleged offense as being very traumatic, combined with the significant trauma inflicted on him by the alleged victim and his father and the cumulation [sic] of these issues with the nature of the police conduct in

this case. In my opinion, the police officer was overzealous and inappropriate with [A.L.], especially in light of his age, immaturity, and the traumatic nature of the situation, and any incriminating evidence should be certainly considered in the light of these factors. Similarly, [A.L.] felt he wanted to help the police and thought if he did so, he could go home. He would have had a limited understanding of his Miranda rights, but not an appreciation as to how they could affect his eventual legal predicament.

* * *

It is my opinion that [A.L.] certainly had the ability to comprehend and understand some of the rights related to not only knowledge of words and ability to understand what is being told when the warnings were given to him. However, an appreciation of the significance of the warnings goes beyond understanding them and addresses whether one can grasp why they are important and the potential of how that right could affect them later on. In my opinion, while [A.L.] has some solid understanding of the rights, it is difficult for him to appreciate how his right to silence could protect him in further legal proceedings for example.

{¶ 34} Dr. Fabian listed the following reasons to support his conclusion: A.L. was brought to the police station by surprise; A.L. did not know why he had certain rights; A.L. had no prior exposure to the legal system; the detective suggested to A.L. that God did not approve of his story; and the detectives told A.L. that he would go home no matter what. Dr. Fabian testified that although A.L. said he understood what the right to remain silent meant, he thought that a defendant should talk if the police wanted the defendant to talk and that a judge could make a defendant talk in court.

{¶ 35} The juvenile court opted not to follow Dr. Fabian's uncontroverted conclusions regarding A.L. Specifically, the court found as follows:

Although Dr. Fabian drew that uncontroverted conclusion [that A.L. did not appreciate the consequences of waiving his *Miranda* rights],

this Court is not obliged to follow that conclusion. * * * One reason why the Court does not rely on Dr. Fabian's conclusion is due to the detectives['] * * * explanation [of the *Miranda* rights]. Moreover, Dr. Fabian explained the privacy waiver process in order for A.L. to participate in the evaluation. Dr. Fabian noted in his report that A.L. understood the waiver of his fundamental right to privacy and allowed Dr. Fabian to proceed with the evaluation. The latter is deemed to be an objectively reasonable fact that the Court can use to reject the expert's opinion that he was incompetent to waive his *Miranda* Rights. Also the fact that the accused has been found competent to stand trial was another reasonable objective factor the Court could use in declining to accept the expert's uncontroverted opinion.

{¶ 36} The juvenile court reasoned its rejection of unrebutted expert testimony as follows: the police explained waiving his *Miranda* rights to A.L.; Dr. Fabian explained waiving his privacy rights to A.L.; Dr. Fabian concluded that A.L. understood his privacy right waiver; A.L. was found competent to stand trial; therefore, A.L. must have properly waived his *Miranda* rights.

{¶ 37} The trier of fact may give whatever weight it deems appropriate to witness testimony, including that of an expert. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). However, this is not a case where the juvenile court found the expert witness's testimony to be unreliable or incredible. Rather, the juvenile court offered a rather baffling reason for ignoring the expert witness's testimony.

{¶ 38} Upon review, we find that A.L. did not make an "uncoerced choice," nor did he have the "requisite level of comprehension" to properly waive his *Miranda* rights. A.L. was brought to the police station under false pretenses when he was ten years old, he did not consult with an adult concerned with his best interest

prior to the interrogation, and he was intimidated by the police into confessing to shooting his stepmother.

{¶ 39} Accordingly, we find that A.L.'s confession violated his *Miranda* rights. The juvenile court erred by denying his motion to suppress, and A.L.'s second assigned error is sustained.

### R.C. 2151.352 and the Right to Have a Parent or Adult Present

{¶ 40} In his third assigned error, A.L. argues that the juvenile court violated R.C. 2151.352 when it admitted into evidence his statements to the police. R.C. 2151.352 states that a "child is entitled to representation by legal counsel at all stages of the proceedings under this chapter or Chapter 2152 of the Revised Code." In *In re M.W.,* 133 Ohio St.3d 309, 2012-Ohio-4538, 978 N.E.2d 164, ¶ 1, the Ohio Supreme Court addressed "whether a juvenile has a statutory right to counsel during a police interrogation conducted before a complaint is filed or an appearance is made in juvenile court."

{¶ 41} The *In re M.W.* court concluded that the word "proceedings" in R.C. 2151.352 meant "court proceedings," and "an interrogation that occurs prior to the filing of a complaint alleging delinquency or prior to an appearance in juvenile court is not a proceeding that falls within the scope of R.C. Chapter 2151." *Id.* at ¶ 23. The court further found the following: "We stress that the only claimed right to counsel in this appeal is a statutory one premised on R.C. 2151.352, and our narrow holding does not address any constitutional right to counsel or the issue of waiver." *Id.* at ¶ 26.

{¶ 42} It is worth noting that a strongly worded three-justice dissent found that "an interrogation of a juvenile is an act or step that is part of a larger action, i.e., the process of adjudicating the juvenile as a delinquent." *In re M.W.*, O'Connor, J., dissenting, at ¶ 37. The dissent concluded that juveniles were entitled to counsel during a police interrogation and found that the majority opinion "offends the United States Supreme Court's constitutional commands on a juvenile's due process and Fifth Amendment rights, our own precedent, and the intent of the General Assembly in enacting R.C. 2151.352." *Id.* at ¶ 29. *See also In re C.S.,* 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, ¶ 98 (in a delinquency proceeding, "[i]f the juvenile is not counseled by his parent, guardian, or custodian and has not consulted with an attorney, he may not waive his right to counsel").

{¶ 43} Nonetheless, in following *In re M.W.,* as we must, we conclude that the juvenile court in the case at hand did not violate R.C. 2151.352 in admitting into evidence A.L.'s statements to the police. Accordingly, A.L.'s third and final assigned error is overruled.

{¶ 44} In summary, A.L.'s first and second assigned errors are sustained, and the statement he made to the police on October 25, 2018, is suppressed.

{¶ 45} Judgment reversed and case remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the juvenile court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, JUDGE

EILEEN T. GALLAGHER, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR