[Cite as *In re O.M.*, 2020-Ohio-5433.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE O.M. : No. 109381

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** November 25, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-18-110731

---

### *Appearances:*

Fernando Mack and Eric L. Foster, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Thomas Rovito and Anthony T. Miranda, Assistant Prosecuting Attorneys, *for appellee.*

PATRICIA ANN BLACKMON, P.J.:

{¶ 1} O.M. appeals from the juvenile court's imposition of the adult portion of his serious youthful offender dispositional sentence and assigns the following error for our review:

> I. The trial court erred by making findings under R.C. 2151.14(E) which were not clearly and convincingly supported by the evidence.

{¶ 2} Having reviewed the record and pertinent law, we reverse the trial court's judgment, because there is not clear and convincing evidence in the record that O.M. is unlikely to be rehabilitated during his remaining period of juvenile detention. The apposite facts follow.

{¶ 3} On October 25, 2018, the juvenile court adjudicated O.M. delinquent for aggravated robbery and other associated offenses, along with firearm and serious youthful offender specifications. O.M., whose date of birth is June 25, 2001, was 17 years old at the time of the adjudication. The court sentenced O.M. to three years at the Ohio Department of Youth Services ("ODYS") and stayed an eight-year prison sentence as part of the serious youthful offender specification.

{¶ 4} While at ODYS, O.M. was involved in over 100 behavioral incidents including being found delinquent of two felonies. ODYS sent a request to the prosecutor's office to invoke the adult portion of O.M.'s sentence. In September 2019, the Cuyahoga County prosecutor's office filed a motion to invoke the adult portion of O.M.'s dispositional sentence. The juvenile court held a hearing, and on December 2, 2019, invoked the eight-year prison term, finding clear and convincing evidence that O.M. was "unlikely to be rehabilitated during the remaining period of juvenile jurisdiction."

{¶ 5} It is from this order that O.M. appeals.

### Serious Youthful Offender Specification

{¶ 6} The overriding purposes of detention in a juvenile facility are "to provide for the care, protection, and mental and physical development of children

subject to this chapter, protect the public interest and safety, and hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender." R.C. 2152.01(A). However, adult punishment may be reserved for serious juvenile offenders who are at least 14 years old, engage in further serious misconduct, and are not amenable to rehabilitation in the juvenile system.

{¶ 7} The Ohio Supreme Court discussed the statutory scheme governing serious youthful offender specifications in *State v. D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, ¶ 18:

> A juvenile charged as a potential serious youthful offender does not face bindover to an adult court; the case remains in the juvenile court. Under R.C. 2152.11(A), a juvenile defendant who commits certain acts is eligible for "a more restrictive disposition." That "more restricted disposition" is a "serious youthful offender" disposition and includes what is known as a blended sentence — a traditional juvenile disposition coupled with the imposition of a stayed adult sentence. R.C. 2152.13. The adult sentence remains stayed unless the juvenile fails to successfully complete his or her traditional juvenile disposition. R.C. 2152.13(D)(2)(a)(iii). Theoretically, the threat of the imposition of an adult sentence encourages a juvenile's cooperation in his own rehabilitation, functioning as both carrot and stick.

{¶ 8} R.C. 2152.14(A) allows the state to file a motion to invoke the adult portion of a juvenile sentence if:

> there is reasonable cause to believe that either of the following misconduct has occurred * * * after the person reached fourteen years of age:
>
> (a) The person committed an act that is a violation of the rules of the institution and that could be charged as any felony or as a first degree misdemeanor offense of violence if committed by an adult.
>
> (b) The person has engaged in conduct that creates a substantial risk to the safety or security of the institution, the community, or the victim.

{¶ 9} Pursuant to R.C. 2152.14(E)(1), a juvenile court must make all of the following findings by clear and convincing evidence prior to imposing the adult portion of a serious youthful offender's dispositional sentence:

(a) The person is serving the juvenile portion of a serious youthful offender dispositional sentence.

(b) The person is at least fourteen years of age and has been admitted to a department of youth services facility, or criminal charges are pending against the person.

(c) The person engaged in the conduct or acts charged under * * * this section, and the person's conduct demonstrates that the person is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction.

{¶ 10} This court has held that a "juvenile must engage in separate conduct detrimental to his own rehabilitation in the juvenile system before he may be committed to an adult facility." *In re M.B.,* 8th Dist. Cuyahoga No. 106434, 2018-Ohio-4334, ¶ 37.

{¶ 11} It is undisputed that O.M. was at least 14 years old when he committed the acts in question, and he was serving the juvenile portion of a serious youthful offender dispositional sentence at ODYS. Furthermore, at the hearing on the state's motion, O.M.'s attorney conceded that O.M. engaged in conduct that satisfies R.C. 2152.14(A)(2)(a) and (b). However, the parties dispute whether O.M.'s conduct presented clear and convincing evidence that he was unlikely to be rehabilitated.

The clear-and-convincing-evidence standard allowed by R.C. 2152.14(E)(1) is less rigorous [than the beyond-a-reasonable-doubt standard], though stronger than a mere preponderance-of-the-evidence standard. We have stated that clear and convincing evidence

is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. The standard requires the judge to have a firm belief or conviction about the facts adduced.

*In re J.V.,* 134 Ohio St.3d 1, 2012-Ohio-4961, 979 N.E.2d 1203, ¶ 20.

### Hearing Testimony

{¶ 12} The following testimony was presented at the hearing on the motion to invoke the adult portion of O.M.'s dispositional sentence:

{¶ 13} James Darnell testified that he is the Superintendent of Indian River Correctional Facility ("Indian River"), the ODYS facility in which O.M. was placed on November 7, 2018. According to Darnell, a Youth Behavioral Incident Report ("YBIR") is a "written reprimand that a youth would receive when they violate a rule." At the time the prosecutor filed the motion to invoke the adult portion of his sentence, O.M. had been at Indian River for approximately ten months and had received 107 YBIRs. O.M. received additional YBIRs between when the motion was filed and the hearing was held, putting his total at over 120.

{¶ 14} Darnell testified that O.M.'s YBIRs summarized "incidents that are assault, fights, gang-related activity, assaults on staff, [and] charges that occurred as a result of those assaults on staff." Darnell noted that O.M. was involved in two incidents of violence the weekend prior to the hearing and one incident of violence the day before the hearing. Darnell testified that O.M.'s conduct has been "a significant security risk and safety risk to the staff and the youth as well as disruptive

of the facility operations.  * * * When those things happen, it in effect stops the functioning of programming."

{¶ 15}  Darnell further testified that during O.M.'s stay at Indian River, O.M. completed various individual and group-therapy sessions as part of his treatment. "He has completed substance abuse education, prep groups, anger, aggression and violence.  The [cognitive behavioral therapy] books one and two.  I believe he's currently in * * * anger * * * regression therapy group."  O.M. earned his GED while at Indian River and recently had been working in the cafeteria.  Darnell testified that O.M. "was not disrespectful to me or inappropriate towards me" during their interactions at Indian River.

{¶ 16}  Darnell testified that there are four behavior levels that juveniles may be placed in, with a Level One designation for the worst behavior and a Level Four designation for the best behavior.  Juveniles may move up and down the levels depending on their conduct.  During O.M.'s stay at Indian River, he was a Level One, Level Two, and Level Three.  At the time of the hearing, and because of the three recent incidents, O.M. was on "Intervention Hearing" status, which happens when a juvenile commits "a high level rule infraction" or "an act of violence."  According to Darnell, "for two weeks you're on a specific designated plan that's restricted.  He would go to an intervention hearing and sanctions could be imposed at that time from that."

{¶ 17}  Darnell also testified about the "gang issues" at Indian River, including the known gang Heartless Felons.

So we have a designated Gang Intervention Specialist * * * and he meets with every youth upon their arrival and discusses * * * the gang issues and the importance of making good decisions and he reviews their history in the community. If there's any gang issues there he documents that also. He tracks and documents any gang activity throughout the building.

{¶ 18} Shawn Anders testified that he is the Security Threat Group Coordinator at Indian River. His primary duty is to "track and monitor the gang activity inside the facility." Of the approximately 150 juveniles detained at Indian River, about 100 identify as gang members. "A little bit around 50, high 40s, low 50s that are considered active. The other 40 to 50 are passive participants."

{¶ 19} Anders testified that "[c]urrently, [O.M.] is identified as a member of the Heartless Felons." The Indian River staff first noticed O.M. involved in gang activity within a month of his arrival in November 2018. There was no indication that O.M. had involvement with the Heartless Felons prior to his time at Indian River.

{¶ 20} According to Anders, coercion and threats are "a big part" of initiating someone into gang activity. For example, a higher ranking gang member may say to a lower ranking member, "you better go physically attack this individual otherwise, this may happen to you * * *." Asked if it would have been "reasonable * * * to believe that [O.M.] received instruction to strike that individual from a Heartless Felon," Anders answered, "It could be. Yes, sir. * * * The attack that he used was an unprovoked assault from behind, that is a tactic that the

Heartless Felons consistently use as a means of performing their will on other non-Heartless Felon members."

{¶ 21} Prior to his most recent behavioral incidents, O.M. was a "passive" member of the Heartless Felons, which means no "significant substantiated Heartless Felon act[s]" within 90 days. O.M. was passive from approximately August 2019, until the incidents that occurred just prior to the hearing on December 2, 2019. Anders testified that O.M. "had a desire to distance himself" from the gang. Sometime in the "early summer, late spring" of 2019, he was moved to a unit "where a lot of kids who had been leaving the gang stuff alone" were housed. He remained there until the week before the hearing.

{¶ 22} Anders testified that during O.M.'s time at Indian River, O.M. was involved in 15 "Signal 5s," which are when all available staff must respond to an incident, and at least two "Signal 88s," which are elevated responses to an immediate emergency when all staff members must respond to an incident. According to Anders, Indian River has "over 360 cameras in our facility that capture activity [and] that record the daily events 24/7/365."

{¶ 23} Anders testified about a November 21, 2018 incident in which O.M. assaulted another juvenile. Anders described what was recorded on surveillance video: The victim "is pushing the yellow laundry cart, doing his job duties on the unit and while doing so he was attacked by [O.M.] in an unprovoked assault which he strikes him in the jaw." According to Anders, O.M. punched this youth twice "very

hard," and the youth "was unable to get up under his own power and the staff member actually had to pick him up because his legs were wobbly."

{¶ 24} On December 26, 2018, O.M. was involved in another incident that was recorded on a video camera located in the dayroom. O.M. "got up out of his seat from the second row, walked over to the table in which [another youth] was sitting at, they're playing cards and then unprovoked attack from behind or from the side, started punching him in the head."

{¶ 25} Dena Freeman testified that she is the Social Worker Supervisor at Indian River, and she oversees the juveniles' therapy programs. O.M. completed the "substance abuse education, phase one and phase two. He is currently in anger aggression and violence groups, he is also in anger regression therapy groups." The goal of the anger groups is "trying to teach him coping skills in how not to allow his anger to cause him to hurt other people." O.M. has participated in 15.2 hours of anger and violence group therapy, an additional 15 hours of individual anger therapy "for when he has assaulted people in the past," and an additional three hours of anger regression therapy.

{¶ 26} According to Freeman, O.M. could have been involved in anger aggression therapy for the remaining two years of his juvenile detention, because it is an ongoing program. As for the anger regression therapy, O.M. completed 3 out of a possible 18 sessions. Freeman testified that in her individual dealings with O.M., he was always respectful to her and told her he "wanted to do good and be a success story."

{¶ 27} Ronald Foster testified that he is a Unit Manager at Indian River. According to Foster, on March 5, 2019, O.M. received a YBIT for "going in an unauthorized area and * * * beginning to tear up the state property," then assaulting a staff member with a keyboard. Additionally, O.M. "started displaying some behaviors that he was going to harm himself and I assisted with removing I believe a sheet or something that he had tied around his neck." O.M. "was facing me directly and he spit in my face." Foster left his radio in O.M.'s room, and O.M. "began to broadcast over the system and make derogatory remarks."

{¶ 28} According to Foster, on January 27, 2019, O.M. "was instructed to stop beating a gang cadence on his chair and his response is that he was a felon, which is in reference to the Heartless Felons, three years strong and continued to do the cadence." On January 28, 2019, O.M. and another juvenile "made threats to be disruptive and damage the unit if they were to receive a YBIR." On January 29, 2019, O.M. "was physically restrained after he began to what they call flip the unit where basically he was causing property damage by throwing chairs and having to be placed in handcuffs. It also says that he lowered his shoulder and rammed into a staff person."

{¶ 29} Foster further testified that O.M. "showed spurts of compliance, but in my opinion, it was important for him to try to fit in with one of our prominent [gang] groups, the Heartless Felons. So that caused for him to receive quite a bit of YBIRs and have noncompliant behavior. * * * [T]here was a lot of disrespect and disruptive behavior and acts of violence." At one point, Foster told O.M. that he "had

matured and come a long way since when he first arrived." A period of "maybe at least two or three weeks" would pass without O.M. receiving a YBIR, and Foster testified that this was "a good thing." O.M. had "been moved to our least restrictive type of units but then would lose that based off of being noncompliant."

{¶ 30} Jeffrey Leist testified that he is a General Activities Therapist at Indian River. On March 5, 2019, O.M. was involved in a disruption with another juvenile. O.M. ripped a keyboard out of the staff podium, and when staff tried to intervene, O.M. hit Leist in the face with the keyboard. This incident was caught on video. Nine to ten staff members responded to the incident. Leist had "bruising along [his] jawline and it was sore for probably about two weeks afterward." Leist also testified about an incident that occurred the weekend before the hearing, which was recorded on video. O.M. and "another youth began fighting and it escalated to fighting with pool sticks and I was struck in the face by [O.M.]. And also in the course of the fight the youth began spitting on each other and he spit on me as well."

{¶ 31} On cross-examination, Leist testified that this other youth initiated the physical altercation with O.M. Leist further testified that it appeared that O.M. was trying to strike the other youth with the pool stick when Leist got involved. This resulted in O.M. striking Leist with the pool stick.

### Juvenile Court's Ruling

{¶ 32} After the hearing, the juvenile court issued a journal entry finding that "the allegations of the motion have been proven by clear and convincing evidence." As stated earlier in this opinion, the only factor regarding the serious youthful

offender specification that is disputed in this case is whether O.M. is unlikely to be rehabilitated during his period of juvenile detention. The juvenile court did not make any specific factual findings regarding this disputed factor.

**Analysis**

{¶ 33} On appeal, O.M. argues that he was "coerced" or "forced" into gang activity while at ODYS and that he "had undergone so little of the individualized behavioral therapy offered by the facility." Our review of the evidence focuses on the disputed R.C. 2152.14(E)(1) factor of whether O.M. "is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction."

{¶ 34} At the time of the hearing, O.M. had served just over one year of his three-year detention at ODYS. The state presented evidence of four behavioral incidents committed by O.M. as clear and convincing evidence that O.M. was unlikely to be rehabilitated. Evidence was also presented that O.M. became a member of the Heartless Felons while at Indian River. According to O.M., he was compelled by gang members to commit the incidents at issue, arguing that "[f]or each incident, testimony was elicited showing that O.M. was never solely at fault."

{¶ 35} Additionally, evidence presented at the hearing shows that O.M. completed just over 33 hours of group and individual therapy related to anger and aggression issues, in addition to completing substance abuse education programs. O.M. received his GED while at Indian River and was employed in the cafeteria.

{¶ 36} We are aware that O.M. received a significant number of YBIRs during his time at Indian River. However, during oral arguments, counsel for O.M.

noted that juveniles may receive YBIRs for a wide range of behavior, including non-compliance, rule infractions, and aggressive conduct.

{¶ 37} Public policy considerations weigh in favor of keeping juvenile offenders in the juvenile system, rather than the adult prison system. For example,

> [s]ubstantial scientific research during the last two decades has discovered significant physiological differences between child and adult brains. Citing this evidence, the United States Supreme Court recognized that in comparison to adults, "juveniles have a '"lack of maturity and an underdeveloped sense of responsibility."'" *Graham v. Florida*, 560 U.S. 48, 68, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), quoting *Roper v. Simmons*, 543 U.S. 551, 569-570, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), quoting *Johnson v. Texas*, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993). Juveniles '"are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.'" *Id.*, quoting *Roper* at 569-570. Amici curiae Juvenile Law Center and National Juvenile Defender Center submitted significant documentation of similar findings. In one article cited by the centers, Laurence Steinberg, a doctor of psychology with a focus on adolescent development, noted that "[a]dolescence is not just a time of tremendous change in the brain's structure. It is also a time of important changes in how the brain works." Steinberg, *Should the Science of Adolescent Brain Development Inform Public Policy?*, 50 Ct.Rev. 70 (2014). Steinberg made the following observations about structural changes that the brain undergoes during adolescence:
>
> First, over the course of adolescence and into early adulthood, there is a strengthening of activity in brain systems involving self-regulation. * * *
>
> Second, there are important changes in the way the brain responds to rewards. * * *
>
> A third change in brain function over the course of adolescence involves increases in the simultaneous involvement of multiple brain regions in response to arousing stimuli, such as pictures of angry or terrified faces.
>
> *Id.* at 70-71. Steinberg concluded that "the consensus emerging from recent research on the adolescent brain is that teenagers are not as mature as adults in either brain structure or function." *Id.* at 71.

Another article cited by the centers described evidence establishing that "the connectivity and efficiency of [cellular] connections" in the prefrontal cortex, the area of the brain responsible for executive functions including short-term memory, attention, inhibitory control, and decision making, "has been shown to continue developing throughout adolescence and early adulthood." Gruber & Yurgelun-Todd, *Neurobiology and the Law: A Role in Juvenile Justice?*, 3 Ohio St.J.Crim.L. 321, 324 (2006).

A juvenile's brain is still developing until the juvenile is 18 years old and is no longer subject to juvenile adjudication, and likely well after. Recent studies suggest that juveniles are less able than adults to regulate their responses to external stimuli and to judge the consequences of their actions. I am not suggesting that this research absolves juveniles from all responsibility for their bad acts. But that research does suggest that even though our juvenile-justice system is based on the theories of protection, treatment, and rehabilitation, it is not properly designed to grapple with the realities of the not-yet-developed brains of juveniles.

*State v. Carnes*, 154 Ohio St.3d 527, 2018-Ohio-3256, 116 N.E.3d 138, ¶ 28-30

(O'Connor, C.J., dissenting).

{¶ 38} Furthermore, the Ohio Supreme Court has held the following:

Juvenile courts are legislative creations, *see In re Agler* (1969), 19 Ohio St.2d 70, 72, 48 O.O.2d 85, 249 N.E.2d 808, "rooted in social welfare philosophy rather than in the corpus juris." *Kent v. United States* (1966), 383 U.S. 541, 554, 86 S. Ct. 1045, 16 L.Ed.2d 84. The juvenile courts were premised on profoundly different assumptions and goals than a criminal court, *United States v. Johnson* (C.A.D.C.1994), 307 U.S. App. D.C. 284, 28 F.3d 151, 157 (Wald, J., dissenting), and eschewed traditional, objective criminal standards and retributive notions of justice. Instead, a new civil adjudication scheme arose, with a focus on the state's role as parens patriae and the vision that the courts would protect the wayward child from "evil influences," "save" him from criminal prosecution, and provide him social and rehabilitative services. *In re T.R.* (1990), 52 Ohio St.3d 6, 15, 556 N.E.2d 439; *Children's Home of Marion Cty. v. Fetter* (1914), 90 Ohio St. 110, 127, 106 N.E. 761, 11 Ohio L. Rep. 518; *Ex parte Januszewski* (C.C.Ohio, 1911), 196 F. 123, 127, 10 Ohio L. Rep. 151.

*In re C.S.,* 115 Ohio St. 3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, ¶ 66. *See also In re C.P.,* 131 Ohio St.3d 513, 2012-Ohio-1446, 967 N.E.2d 729, ¶ 41 ("Juvenile offenders are more capable of change than adult offenders").

{¶ 39} In the past two decades, the United States Supreme Court has released decisions that essentially create a special status of juvenile offenders in light of the Eighth Amendment's prohibition on cruel and unusual punishment. In *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 2460, 183 L.Ed.2d 407 (2012), the court held that a "mandatory life without parole [prison sentence] for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" In *Graham v. Florida*, 560 U.S. 48, 74, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), the court held that "for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole." In *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the court held that the Eighth Amendment prohibits the imposition of the death penalty on juvenile offenders.

{¶ 40} In deciding this line of cases, the United States Supreme Court acknowledged the "qualities that distinguish juveniles from adults * * *.[1]" *Roper* at 574. "It is difficult even for psychologists to differentiate between the juvenile

---

[1] For an in-depth review of policy trends regarding the juvenile justice system, see Elizabeth S. Scott, SYMPOSIUM: "*YOUTH MATTERS: MILLER V. ALABAMA AND THE FUTURE OF JUVENILE SENTENCING*": Guest Editor: John F. Stinneford: "*Children are Different*": Constitutional Values and Justice Policy, 11 Ohio St. J. Crim. L. 71, 101 (Oct. 1, 2013) ("most juveniles are likely to desist from offending as they mature into adulthood — unless the justice system pushes them in the direction of a criminal career").

offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 573. In *Miller*, the court identified "three significant gaps between juveniles and adults." *Miller* at 471.

> First, children have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S., at 569, 125 S. Ct. 1183, 161 L. Ed. 2d 1. Second, children "are more vulnerable * * * to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid.* And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.,* at 570, 125 S. Ct. 1183, 161 L. Ed. 2d 1.

*Miller* at 471.

{¶ 41} These same policy arguments that the nation's highest court has relied on to chip away at harsh sentences for juvenile offenders can be applied to taking a more pragmatic approach to Ohio's serious youthful offender statute. We are aware that this statute passed constitutional muster in *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, 979 N.E.2d 1203. *But see* Emily L. Barth, Comment: *Blurring the Lines: When the "Best Interests of the Child" Fall to the Wayside. An analysis of Ohio's Serious Youthful Offender Statute*, 79 U. Cin. L. Rev. 323, 344 (Fall, 2010) ("[T]he punitive nature of the SYO statute, especially the imposition of adult prison time, has destroyed any vestiges of the rehabilitative goals of the juvenile court system. Without the essential procedural due process right of a jury trial, juveniles

sentenced under the discretionary SYO statute become vulnerable to arbitrary and unnecessary punishment.").

{¶ 42} This does not mean, however, that the application of this statute cannot be challenged on a case-by-case basis. In the case at hand, O.M.'s conduct, which we do not condone, did not involve the most serious offenses, such as murder or rape. Evidence in the record shows that O.M. was influenced by his gang membership, and there is nothing to suggest that O.M. was involved in a gang prior to his time at ODYS. O.M. completed approximately one-third of his juvenile sentence at the time the state filed its motion to invoke the adult portion of his sentence, and O.M. had not yet completed most of the therapy programs offered by ODYS. In short, there is not clear and convincing evidence that O.M. was unlikely to be rehabilitated, and we find that the invocation of his adult sentence was premature. Accordingly, O.M.'s sole assigned error is sustained.

{¶ 43} Judgment reversed and case remanded to the juvenile court for proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_Patricia Ann Blackmon_
PATRICIA ANN BLACKMON, PRESIDING JUDGE

LARRY A. JONES, SR., J., and
MARY EILEEN KILBANE, J., CONCUR